UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                    :
PING CHEN, on behalf of the United States of :
America, the State of New York, and the City :
of New York,                                        :
                                                    :
                              Plaintiff-Relator,  :
                                                    :
               -v-                                  :
                                                    :
EMSL ANALYTICAL, INC., et al.,                    :
                                                    :
                              Defendants.  :
                                                    :
----------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  8/16/13

No. 10 Civ. 7504 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff-Relator Ping Chen brings this action against Defendants EMSL Analytical, Inc. ("EMSL"), The Louis Berger Group, Inc. ("Louis Berger"), Taylor Environmental Group, Inc. ("Taylor"), J.C. Broderick & Associates Inc. ("J.C. Broderick"), Hillman Environmental Co, Inc. and Hillman Environmental Group, L.L.C. (together, "Hillman"), Airtek Environmental Corp. ("Airtek"), Liro Engineers, Inc. ("Liro"), McCabe Environmental Services, L.L.C. ("McCabe"), ATC Associates, Inc. ("ATC"), JLC Environmental Consultants, Inc. ("JLC"), Detail Associates ("Detail"), Ambient Group, Inc. ("Ambient"), Warren & Panzer, Engineers, P.C. ("Warren & Panzer") and Consulting & Testing Services, Inc. ("Consulting & Testing"). Plaintiff alleges that Defendants, all of which operate in the asbestos air testing industry, violated the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., and its state and local counterparts, N.Y.S. Fin. L. § 188 et seq., and N.Y.C. Admin. Code § 7-801 et seq. ("New York FCA" and "New York City FCA," respectively).

Defendants have moved to dismiss on the grounds that: (i) Plaintiff's claims are barred by the FCA's public disclosure provision and (ii) Plaintiff has failed to plead his claims with particularity.  EMSL seeks dismissal on the additional basis that it was not properly served. Warren & Panzer and ATC also seek attorneys' fees.

The Court agrees as to each asserted basis for dismissal.  Accordingly, this action is dismissed in its entirety.  The motions for attorneys' fees are denied.

## BACKGROUND[1]

### *Plaintiff Ping Chen*

Plaintiff holds "a degree equivalent to a Doctor of Public Health" from Shanghai Medical University and a masters degree in Environmental Health Science from The City University of New York.  (Relator's Third Amended Complaint ("Complaint") ¶ 36.)  He is also an accredited "Laboratory Director."  (Id. ¶¶ 37-38.)

Prior to coming to the United States, Plaintiff was an Assistant Professor at Shanghai Medical University.  (Id. ¶ 36.)  He has worked in the U.S. air monitoring industry for twenty-four years and has "accumulated rich asbestos testing experience."  (Id. ¶ 39.)  Following the September 11 attacks, Plaintiff was a member of the emergency response team that performed air quality analysis at the World Trade Center.  (Id. ¶ 40.)

Plaintiff worked for Detail as a lab director for nearly eighteen years, and also worked as a part-time analyst for Airtek from 1989 to 2007.  (Id. ¶¶ 71, 96.)  From October 2006 to February 2010, Plaintiff worked as a "weekend/night shift supervisor" at EMSL where his job duties included "testing and analyzing asbestos air samples."  (Id. ¶ 41.)

---

[1]     Unless otherwise noted, the following is taken from Plaintiff's Third Amended Complaint, the allegations of which are assumed true for purposes of Defendants' motions, as well as from material of which the Court may take judicial notice.  See Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011).

***The Asbestos Testing Process***

When government buildings containing asbestos are demolished or renovated, asbestos fibers can become airborne, posing a significant health hazard.  (Id. ¶¶ 27-28.)  Before such projects commence, asbestos abatement companies are retained to remove materials that contain asbestos.  (Id. ¶ 29.)

To ensure that asbestos abatement processes are effective, air monitoring companies are also retained to collect air samples at abatement sites.  (Id. ¶¶ 28-29.)  According to the Complaint, all Defendants, except for EMSL, are air monitoring companies ("Air Monitoring Defendants").  (Id. p. 2.)  Air monitoring companies collect air samples before, during and after abatement work is performed.  (Id. ¶ 52.)  They then submit the samples to an environmental testing company like EMSL to analyze the samples and report as to the presence or absence of asbestos fibers contained therein.  (Id. ¶ 29.)  If the tested samples do not meet federal and state regulations, further abatement work must be performed.  (Id. ¶ 53.)

***The Complaint's Allegations Against the Air Monitoring Defendants***

Plaintiff alleges that "[i]n order to obtain favorable testing reports," the Air Monitoring Defendants "for many years . . . fraudulently provided countless fake air samples, namely, blank cassettes, to environmental testing service companies, such as EMSL, for testing."  (Id. ¶ 54.) These "fake" samples "would definitely pass the tests because there was nothing in them."  (Id. ¶ 55.)  Plaintiff alleges to have "learned about the fake samples" submitted by the Air Monitoring Defendants while at EMSL by "personally coming across the[m] . . . and discussing [them] with EMSL's employees who have personal knowledge about the fake samples."  (Id. ¶ 43.)  As a supervisor, Plaintiff "had access to EMSL's air sample analysis records showing that countless air samples provided by [the Air Monitoring Defendants] were fake."  (Id. ¶ 55.)  Plaintiff

attaches copies of such records to the Complaint.  (Id. Ex. 1.)

The Complaint asserts the following allegations (or substantially similar allegations) as to most or all of the Air Monitoring Defendants:

- Each of the Air Monitoring Defendants provides services to government agencies in connection with government projects.  As to each Air Monitoring Defendant, the Complaint lists at least one government agency or one government project for which that Defendant has provided services.  For instance, as to McCabe, the Complaint alleges:  "McCabe Environmental is an air monitoring firm which provides its services for federal, state, and local government projects and government agencies such as the SCA; New York City MTA; New York City Department of Transportation; Port Authority of New York and New Jersey; and the New Jersey Transit Authority."  (Id. ¶ 102.)[2]

- "Most post-abatement air samples" provided to EMSL by the Air Monitoring Defendants were "fake."  (Id. ¶ 64.)  Plaintiff "personally" or "regularly" reviewed a "substantial amount" or "large volume" of "fake samples" submitted by a number of Air Monitoring Defendants.[3]

- The Air Monitoring Defendants "had knowledge that the samples collected and provided to EMSL were either improperly taken, fake, and/or blank."  (Id. ¶ 102.)[4]

- The Air Monitoring Defendants billed the government, directly or indirectly, for the samples they collected and were compensated for doing so.  For instance, as to McCabe, the Complaint alleges:  "[B]ased on the samples collected and provided to EMSL for analysis, McCabe Environmental would either invoice the government agencies directly for the service performed or invoice the general contractors who would then bill the government.  Thus whether McCabe Environmental invoiced the government or the general contractor, they received compensation for their services provided from the government."  (Id. ¶ 102.)[5]

---

[2] See also, id., ¶ 59 (Louis Berger); ¶ 61 (J.C. Broderick); ¶ 65 (Taylor); ¶¶ 67, 69 (Hillman); ¶¶ 70, 72-73 (Airtek); ¶ 100 (Liro Engineers); ¶¶ 83-84 (ATC); ¶ 94 (JLC); ¶ 96 (Detail); ¶¶ 74-75, 88 (Ambient Group); ¶ 89 (Warren & Panzer); ¶ 98 (Consulting & Testing).

[3] Id. ¶ 60 (Louis Berger); ¶ 62 (J.C. Broderick); ¶ 66 (Taylor); ¶ 68 (Hillman); ¶ 101 (Liro); ¶ 103 (McCabe); ¶ 95 (JLC); ¶ 97 (Detail); ¶ 99 (Consulting & Testing).  The Complaint does not contain such an allegation, or one substantially similar, as to Airtek, ATC, Ambient or Warren & Panzer.

[4] See also, id., ¶ 59 (Louis Berger); ¶ 61 (J.C. Broderick); ¶ 65 (Taylor); ¶ 67 (Hillman); ¶ 73 (Airtek); ¶ 100 (Liro); ¶ 94 (JLC);  ¶ 88 (Ambient); ¶ 93 (Warren & Panzer); ¶ 98 (Consulting & Testing).  The Complaint does not contain such an allegation, or one substantially similar, as to ATC or Detail.

[5] See also, id., ¶ 59 (Louis Berger); ¶ 61 (J.C. Broderick); ¶ 65 (Taylor); ¶ 67 (Hillman); ¶ 73 (Airtek); ¶ 100 (Liro); ¶ 94 (JLC); ¶¶ 79, 88 (Ambient); ¶ 93 (Warren & Panzer); ¶ 98 (Consulting & Testing).  The Complaint does not contain such an allegation, or one substantially similar, as to ATC or Detail.

- The Air Monitoring Defendants did "not have an in-house lab" and sent their air samples "to EMSL for analysis."[6]

  The Complaint also contains the following additional allegations specific to particular Air

Monitoring Defendants:

- Louis Berger and J.C. Broderick:  Louis Berger and J.C. Broderick "sent about 50 to 300, sometimes even 500, air samples to EMSL every[]day."  (Id. ¶ 63.)

- Taylor, Hillman and Consulting & Testing:  "About 50% to 80% of the post-abatement samples provided by Hillman, Taylor Environment Group [sic], and CTSI [Consulting & Testing] were fake."  (Id. ¶ 64.)

- Airtek:  "Based on [Plaintiff's] personal knowledge gained from employment with Airtek," "Airtek's most samples [sic] were fake" and that "[d]uring his employment at Airtek, [he] personally came across Airtek's fake air samples and reviewed documents showing fake samples from Airtek's various federal, state, and NYC projects."  (Id. ¶ 72.)

- Ambient: Plaintiff "personally knows two analysts working for Ambient Group, Inc. who were [his] former colleagues . . . at EMSL."  (Id. ¶ 76.)  "From 2006 to 2009, these two analysts told [Plaintiff] multiples times that numerous air samples analyzed by . . . Ambient Group, Inc. . . . were fake."  (Id. ¶ 77.)

  "These two analysts . . . have a lab in the basement of their house in East Brunswick, NJ, called Asbestos Analytical Lab" which is "not accredited."  (Id. ¶ 78.)  Plaintiff alleges that "Ambient would send its air samples to these two analysts to be analyzed in their basement.  However, the reports would be issued under Ambient's name so that it would look like that they [sic] were analyzed by Ambient."  Ambient would then "submit[] these false reports and invoices to the government and/or general contractors for payments."  (Id. ¶¶ 79, 82.)

  Plaintiff separately alleges that he "heard from Ronald McDonald, the owner of A.Mac, which is also a contractor known to Mr. Chen, about the fraudulent practice at Ambient."  (Id. ¶ 80.)  "From 2007 to 2010, Mr. McDonald told [Relator] that a supervisor that he hired dropped off TEM samples multiple times at Asbestos Analytical Lab."  (Id. ¶ 81.)  Although Asbestos Analytical Lab "was not accredited by ELAP to perform TEM analysis," "numerous samples were delivered and analyzed by Asbestos Analytical Lab for TEM analysis and were invoiced under the name of Ambient."  (Id. ¶ 82.)

---

[6]      Id. ¶ 59 (Louis Berger); ¶ 61 (J.C. Broderick); ¶ 65 (Taylor); ¶ 67 (Hillman); ¶ 100 (Liro); ¶ 102 (McCabe); ¶ 98 (Consulting & Testing).  The Complaint does not contain such an allegation, or one substantially similar, as to Airtek, JLC, Ambient, Warren & Panzer, ATC or Detail.

A certain "Roman Peysakhova analyzed samples in his basement, where he had set up an unauthorized lab and issued reports as though they were completed in Ambient's lab." (Id. ¶ 88.)

- ATC: From 2006 to 2009, two Ambient analysts Plaintiff knows "told [him] multiples times that numerous air samples analyzed by ATC . . . were fake" and that "[a] great many of these samples were taken by ATC . . . themselves." (Id. ¶ 77.)   Separately, "[i]n approximately 2010, [Plaintiff] also personally learned from a sampling technician of ATC that the vast majority of the air samples were fake." (Id. ¶ 86.)

  "In 2010 or 2011, ATC bid $1 to $2 per sample for PCM analysis for several government projects and earned contract work including the Brooklyn Navy Yard project. The cost for PCM analysis is at least several dollars per sample. There is only one way for ATC to possibly make money on the project: fake samples and/or fake analysis." (Id. ¶ 85.)

- Warren & Panzer: Plaintiff alleges that a "former colleague of [his] at EMSL" who "[c]urrently works for Warren & Panzer" told Plaintiff on September 9, 2011 that "all Warren & Panzer, Engineers, P.C.'s air samples had been fake," and that "Warren & Panzer's own technicians took these air samples themselves," a "majority" of which were from "SCA jobs." (Id. ¶¶ 90-92.)

***The Complaint's Allegations Against EMSL***

EMSL is the largest environmental testing service company in the world. (Id. ¶ 46.) Approximately 50% of EMSL's revenue derives from asbestos testing and related services. (Id. ¶ 47.) To receive compensation for those services, EMSL invoices the federal, state and local government directly, or charges general contractors, which in turn seek government reimbursement. (Id. ¶ 51.) EMSL was aware that the Air Monitoring Defendants submitted to it "false and useless" air samples, and it "conspired" with them by generating inaccurate "data and testing reports" that were then used to "obtain funds from the federal, state, and local government." (Id. ¶¶ 57-58.) EMSL has submitted "countless false and useless asbestos testing reports" in connection with "numerous federal, state, and city construction projects." (Id. ¶ 119.)

When working at EMSL, Plaintiff alleges to have "voiced his concern about the falsified data and fake samples multiple times" to his lab manager, Jim Hall. (Id. ¶ 122.) Mr. Hall

allegedly told Plaintiff that "he knew the samples provided by some clients were fake" and that

he knew "these clients never took real samples for rush analysis because they could not afford

failed results as they would cause delay to the construction projects."  (Id. ¶ 125.)  He further

explained that "a lot of clients never collected real air samples but submitted blank cassettes

instead."  (Id. ¶ 126.)  "These blank cassettes had nothing on it [sic] and thus the analysis would

definitely return good results."  (Id. ¶ 126.)  Mr. Hall also "admitted EMSL's illegal practice but

indicated that he did not care," explaining that "that's how [EMSL] make[s] money."  (Id. ¶

123.)

        Plaintiff also alleges that EMSL "recklessly disregarded various regulations and

intentionally engaged in other illegal and fraudulent practices."  (Id. ¶ 104.)  For instance,

"EMSL willfully disregarded the applicable regulations and required its analysts to work at a

speed not permitted" by the governing regulations.  (Id. ¶¶ 105-109.)  Plaintiff further alleges

that, at EMSL, "the same analyst who analyzed the air samples would fabricate the quality

control data," and "[i]n order to cover it up . . . a different analyst would be asked to sign off on

data so that it would appear that independent quality control had been performed."  (Id. ¶ 117.)

As a result of these violations "all the data generated by such improper procedures are fraudulent

and false," and the "testing reports based on these data virtually have no practical value."  (Id. ¶

118.)

        As a result of the Air Monitoring Defendants' and EMSL's alleged frauds, the Complaint

alleges that:

>       a huge amount of government funds have been wasted by EMSL and its co-
>       defendants, who are government contractors.  For instance, upon information and
>       belief, SCA spent more than one billion dollars each year on asbestos testing,
>       removal and monitoring for thousands of schools in New York City.  However,
>       the valuable resources were wasted on false and useless asbestos testing reports.

(Id. ¶ 120.)

***Air Monitoring Industry Prosecutions***

   1.  <u>Certified Environmental Services, Inc. Prosecution</u>

      On May 28, 2009, a grand jury sitting in the Northern District of New York returned an indictment charging Certified Environmental Services, Inc. ("CES"), an asbestos air monitoring company and laboratory, and certain of its employees with, inter alia, conspiring to defraud the United States by "impeding and impairing the governmental functions of the U.S. Environmental Protection Agency and U.S. Department of Labor, [and] Occupational Safety and Health Administration . . . for assuring that those performing asbestos abatement and sampling/analysis activities comply with environmental and worker-safety laws."   <u>See</u> <u>U.S. v. Certified Environmental Servs., Inc.</u>, 5:09-CR-319 (N.D.N.Y. May 28, 2009) (Dkt. 1, at ¶ 2) ("CES Indictment" or, generally, "CES Prosecution").   The CES Indictment described a fraudulent scheme whereby, inter alia, CES gave asbestos abatement contractors false and fraudulent air results which led building owners to believe that asbestos has been properly removed.  (<u>Id.</u> ¶ 7.) It listed numerous removal sites in Syracuse and other upstate New York areas for which fraudulent laboratory results were generated.  (<u>Id.</u>  ¶¶ 21-83.)

      The next day, several online media publications re-published information about the CES Prosecution:

- The United States Attorney for the Northern District of New York issued a press release announcing the CES Prosecution and detailing the allegations in the CES Indictment.

- The news website Syracuse.com published an article about the CES Indictment titled, "Indictment accuses Syracuse lab of faking asbestos results for almost a decade."  The article reviewed the contents of the Indictment, stating that "[t]he air monitoring company and laboratory gave contractors false air test results, leading building owners to believe the asbestos had been properly removed" even though it had not "perform[ed] the required tests."  It noted that the CES

indictment "accuses the third major asbestos fraud scam in Central New York within the past five years."

- The news website, www.cnycentral.com, published a similar article that also detailed the CES Indictment's allegations.

(Declaration of Jillian L. McNeil in Support of Joint Motion to Dismiss Third Amended Complaint, Dkt. 64-2, at Exs. H-J.)

2. <u>Todaro Prosecution</u>

On March 26, 2010, the United States Attorney for the Southern District of New York publicly filed an information in a criminal prosecution against Saverio Todaro.  See <u>U.S. v. Todaro</u>, 10 Cr. 268 (KMW) (S.D.N.Y. March 26, 2010) (Dkt. 2) ("Todaro Information" or, generally, "Todaro Prosecution").  The Todaro Information asserted, inter alia, two counts of mail fraud in connection with "Asbestos Air Monitoring" against Todaro, described as "a New York State licensed asbestos air sampling technician" who "purported to conduct asbestos air monitoring through his company, SAF."  (<u>Id.</u> ¶ 9(d).)  The Todaro Information alleged that:

> On hundreds of occasions . . . SAVERIO TODARO, the defendant, created and caused to be created bogus laboratory reports purporting to set forth the results of asbestos air monitoring and lead clearance testing purportedly performed at sites in which demolition and renovation activities were occurring or had occurred. TODARO mailed these reports, and caused them to be mailed, along with invoices for payment for his purported services, to customers. . . .

> Some of the fraudulent invoices submitted by SAVERIO TODARO, the defendant, were ultimately paid for under New York City government programs, administered by HPD [Housing Preservation and Development], under which buildings in New York City were renovated, demolished, or demolished and re-built.

(<u>Id.</u> ¶¶ 11-12.)

The same day, March 26, 2010, Todaro pleaded guilty to the relevant counts, and his plea was announced in a press release stating that "TODARO pleaded guilty . . . to falsifying hundreds of lead and asbestos inspection and testing reports for residences and other locations

throughout the New York City area." (Declaration of Claude M. Millman ("Millman Decl."),

Dkt. 98, at Ex. E.) The press release continued:

> TODARO was a lead risk assessor certified by the EPA as well as a New York
> State licensed asbestos air sampling technician. TODARO operated a company
> called SAF Environmental Corp. ("SAF") through which he purported to perform
> environmental inspection and testing services—including lead clearance testing,
> asbestos air monitoring, and asbestos inspections—in the New York City area.
> Over a period of several years, however, TODARO falsified hundreds of lead and
> asbestos reports and forms, indicating in these false reports that certain
> inspections and tests had been performed to determine the presence, amount
> and/or level of lead and/or asbestos when, in fact, they had not. . . .

Id. The press release also repeated relevant portions of the Todaro Information.

On April 26, 2010, *The New York Times* published an article about the Todaro

Prosecution entitled "Inspector Says He Faked Data in New York Building Tests." (Millman

Decl. Ex. B.) The article states, in part:

> A safety inspector licensed to make critical assessments of asbestos and lead risks
> in buildings and at construction sites across the city made a stunning admission in
> federal court: Despite filing hundreds of reports saying his tests had found no
> danger, he had not performed a single one of the tests. The inspector, Saverio F.
> Todaro, 68, submitted clean asbestos or lead test results for well over 200
> buildings and apartments, including some that were demolished or renovated to
> make way for publicly financed projects under the Bloomberg administration's
> affordable-housing program, according to people briefed on the matter and court
> papers. . . .

> His admissions late last month have raised troubling questions about whether such
> conduct might be more widespread, and it has led to an expanding inquiry focused
> on some aspects of the work of asbestos and lead inspectors in the city. "Todaro's
> guilty plea is not the end of the story," said the Manhattan United States attorney,
> Preet Bharara. "This investigation is very much ongoing." The investigation, in
> part, seeks to determine whether he conspired with others—taking bribes to
> fashion crude forgeries and mask his failure to conduct any tests—or whether he
> acted alone for other reasons, officials said. . . .

> "It's the tip of the iceberg," said one official briefed on the matter and on the
> issues facing city and federal regulators, who spoke on the condition of
> anonymity because the inquiry is continuing. "We just don't know how big the
> iceberg is." . . .

> [I]n addition to the continuing investigation that grew out of the charges against Mr. Todaro, there are now six other unrelated federal cases under way exploring allegations of similar practices in the New York City area.  Some 1,500 people hold city or federal certifications to test for lead or asbestos in the area.  One line of inquiry for investigators in the case involving Mr. Todaro is whether any building owners, management firms or contractors for whom he or other inspectors worked paid bribes for the bogus inspection reports. Officials say substantial sums of money could have been saved by allowing the demolition of buildings without performing expensive asbestos abatement.  Indeed, several current and former law enforcement officials and industry experts underscored that the city's construction industry, and in particular the demolition and asbestos abatement sectors, have a rich history of corruption. . . .
>
> The precise targets of the growing investigation are unclear, and several people briefed on the matter said it may be some time before determinations are made as to whether others will be charged.

(Id.)  The next day, a version of the article appeared on the front page of the print version of *The New York Times*.[7]

### Recent History

Plaintiff commenced this action on October 1, 2010.  (Dkt. 1.)  Because he brought suit under the False Claims Act, his original complaint was placed under seal to afford government authorities time to consider whether to intervene.  See 31 U.S.C. § 3730(b)(2).  The government ultimately declined to intervene, and the original complaint was unsealed as of June 1, 2012.  (Dkt. 16.)   Also on June 1, 2012, and again on September 5, 2012, Plaintiff amended his complaint.  (Dkts. 17, 21.)  After Defendants advised Plaintiff of the bases for their contemplated dismissal motions, as required by the Court's Individual Rule & Practices, the Court granted Plaintiff leave to file the Complaint.  (Dkt. 41.)  He did so on October 12, 2012.  (Dkt. 49.)

---

[7]     See  http://www.nytimes.com/2010/04/27/nyregion/27inspect.html?pagewanted=all  ("A version of this article appeared in print on April 27, 2010, on page A1 of the New York edition.").

**STANDARD OF REVIEW**

### 1. The Amended FCA

On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act ("PPACA"), provisions of which amended the FCA.  As Plaintiff filed his original complaint on October 1, 2010, the FCA, as amended by the PPACA, applies to his claims.  See, e.g., U.S. ex rel. Osheroff v. HealthSpring, Inc., No. 3:10-1015, 2013 WL 1399344, at *4, *7 (M.D.Tenn. Apr. 5, 2013) (applying FCA as modified by PPACA to complaint filed in October 2010); U.S. ex rel. Sanchez v. Abuabara, No. 10-61673-CIV, 2012 WL 1999527, at *2 n.1 (S.D. Fla. June 4, 2012) ("Since the suit in this case was filed many months after the Act was signed into law, this Court will apply the amended language.").

The PPACA amended the FCA's public disclosure provision, codified at 31 U.S.C. § 3730(e)(4), in several key respects.  See Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119 (Mar. 23, 2010).  The Court discusses the substance of the amended provision in detail below, but must note here one amendment that affects the standard of the Court's review.  Prior to the PPACA's enactment, § 3730(e)(4) provided that "[n]o court [had] jurisdiction over an action" the allegations of which had been previously publicly disclosed.  A defendant invoking the public disclosure bar therefore challenged a court's subject matter jurisdiction.  See Rockwell Intern. Corp. v. U.S., 549 U.S. 457 (2007).  After the PPACA's enactment, § 3730(e)(4) provides that a "court shall dismiss an action or claim" when the provision applies.  The few district courts to have addressed the issue are split as to whether the public disclosure provision remains jurisdictional in nature.  Compare U.S. ex rel. Paulos v. Stryker Corp., No. 11-0041-CV-W-ODS, 2013 WL 2666346, at *3 (W.D. Mo. June 12, 2013) ("After the 2010 amendment, the bar does is [sic] not described as jurisdictional in nature."), U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc., No.

1:11-cv-962-WSD, 2013 WL 2303768, at *8 n.15 (N.D. Ga. May 17, 2013) ("Effective March 23, 2010, the public disclosure bar was amended to narrow its applicability and to make it a basis for dismissal, not a jurisdictional threshold."), and U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth., 1:10-CV-322, 2013 WL 3912571, at *7 n.6 (E.D. Tenn. July 29, 2013) ("[T]he pre-PPACA language made the public disclosure bar jurisdictional in nature whereas the post-PPACA language still provides a basis for dismissal but that basis is no longer jurisdictional."), with U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc., No. 1:11cv371, 2013 WL 1189707, at *9 (E.D. Va. Mar. 21, 2013) (concluding, after some analysis, that the provision remains jurisdictional) and Abuabara, 2012 WL 1999527, at *4 (quoting post-amendment language, but but conducting 12(b)(1) analysis).[8]

　　　To determine whether to classify a statutory limitation as jurisdictional, a court inquires into whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement, courts should treat the restriction as nonjurisdictional.  See Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 127 (2d Cir. 2011) (where federal statute did not "speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts," it was not jurisdictional) (citation and internal punctuation omitted).  Not only is there such no clear statement in the present incarnation of the public disclosure provision, but, as explained immediately above, Congress deliberately *removed* such clear language from the provision when it could have kept it in.  The Court therefore holds that the public disclosure provision is no longer jurisdictional in nature, but rather provides a basis for dismissal.

---

[8]　　　See also U.S. v. Omnicare, Inc., 07 C 05777, 2013 WL 3819671, at *6 n.3 (N.D. Ill. July 23, 2013) ("The amendment . . . arguably might affect a determination of whether the disclosure bar is jurisdictional.").

In light of this ruling, contrary to Defendant's suggestion, the Court is not permitted, as it would be on a motion challenging its jurisdiction, to refer to evidence outside the pleadings, nor does the burden rest with Plaintiff.  See Hamm v. United States, 483 F.3d 135, 137 (2d Cir. 2007) ("In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.") (quoting Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002)).  Accordingly, the Court will not consider the various declarations submitted by the parties, except to the extent they have been provided to place before the Court documents that may be considered on a motion to dismiss, in this case, judicially-noticeable public disclosures.  See Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008) (taking judicial notice of "the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents") (emphasis in original).  As discussed below, dismissal is appropriate based on the Complaint's allegations and these disclosures without resort to the additional materials submitted in or through the parties' declarations.

**2.  Federal Rules of Civil Procedure 12(b)(6) and 9(b)**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted).  The complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A complaint that offers only "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'"

therefore, "'will not do.'"  Id. (quoting Twombly, 550 U.S. at 555).  Nor will a complaint that

contains "'naked assertion[s]' devoid of further 'factual enhancement.'"  Id. (quoting Twombly,

550 U.S. at 557).

Moreover, as discussed in greater detail below, because FCA claims "fall within the

express scope of Rule 9(b)," Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir.

1995), relators must "state with particularity the circumstances constituting fraud."  Fed. R. Civ.

P. 9(b).

<h3 style="text-align:center"><u>DISCUSSION</u></h3>

The Court holds that: (1) Plaintiff's FCA claims must be dismissed under the statute's

public disclosure provision; (2) Plaintiff's FCA claims are deficient on the independent basis that

they are not pleaded with particularity; (3) dismissal is also warranted against EMSL on the basis

that it was not properly served; (4) Plaintiff's claims under the New York FCA and New York

City FCA, which are substantially the same as Plaintiff's claims under the federal FCA, must

also be dismissed; and (5) the motions for attorneys' fees are denied.

**1.  The FCA's Public Disclosure Provision Requires Dismissal**

The FCA "is the United States Government's primary tool for redressing fraud against

the Government."  Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* §

1:1.  Not only does the FCA "provide[] the Government a powerful means of combating fraud

through an action for multiple damages and penalties," it "supplements the Government's

enforcement efforts by authorizing private citizens with information about fraud to initiate a civil

action on the Government's behalf."  Id.  Such private, or *qui tam*, actions "seek[] to tap the self-

interest of individuals with information about fraud against the Government," id., by "allowing

*qui tam* relators to share in any recovery."  U.S. ex rel. Doe v. John Doe Corp., 960 F.2d 318,

15

321 (2d Cir. 1992).  In the past, however

> that financial incentive worked against the government's interests in exposing fraud and recouping lost money.  As originally enacted, the FCA did not require that relators bring any new information to the government's attention; rather, individuals were able to bring suit based solely on information already uncovered in the government's investigation and, then, share in the award.

Id.  (citing U.S. ex rel. Marcus v. Hess, 317 U.S. 537 (1943)).  In Marcus, the relator's civil complaint was "substantially identical" to a previously-released criminal indictment, with some paragraphs of the complaint "being almost verbatim copies" of the indictment.  317 U.S. at 558 (Jackson, J., dissenting).  A majority of the Court nonetheless found no language in the FCA that barred relator's action even where his knowledge of the fraud was solely the product of the government's investigation, not his own.  Id. at 545.  In response to Marcus, "Congress immediately amended the qui tam provisions of the FCA to bar all qui tam actions based on information that the government already possessed."  Doe, 960 F.2d at 321.

Hence the FCA's public disclosure provision, the purpose of which is "to bar 'parasitic lawsuits' based upon publicly-disclosed information in which would-be relators 'seek remuneration although they contributed nothing to the exposure of the fraud.'"  U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) (quoting Doe, 960 F.2d at 319); see also U.S. ex rel. Jamison v. McKesson Corp., 649 F.3d 322, 332 (5th Cir. 2011) ("[A] qui tam relator could arbitrarily select a large group of defendants in any industry in which public disclosures have revealed significant fraud, in hopes that his allegations will prove true for at least a few defendants.  We do not countenance such relator lotteries which are quintessentially parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud and which the public dislcosure bar is designed to prevent.") (citation and internal quotation marks omitted).

Congress has since amended the FCA more than once to attempt to "strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud." Doe, 960 F.2d at 321.  In 1986, Congress "amended the False Claims Act, in part to correct restrictive court interpretations that tend[ed] to thwart the effectiveness of the statute" and to "encourage more private enforcement suits." U.S. v. Johnson Controls, Inc., 457 F.3d 1009, 1016, n.5 (9th Cir. 2006) (citations and internal punctuation omitted).

More recently, as discussed above, Congress again amended the FCA's public disclosure provision, as part of the PPACA.  In its present form, the public disclosure provision reads:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).  The statute then defines who falls into the "original source" exception:

> For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).[9]

Section 3730(e)(4) thus establishes a two-part test for determining whether dismissal is required.   A court must first determine whether "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" through one of the sources listed in the statute.   If that is the case, a court must then consider whether the relator is an "original source of the information" as defined in § 3740(e)(4)(B).

As discussed below, the Court finds that (a) the fraud alleged in the Complaint was "publicly disclosed" and (b) that Plaintiff is not an "original source."   His claims must therefore be dismissed.

### a.   The Alleged Fraud Was Publicly Disclosed

Plaintiff does not dispute that the documents disclosed in connection with the CES and Todaro Prosecutions constitute public disclosures within the meaning of § 3730(e)(4)(A).   The charging instruments in each prosecution, the CES Indictment and the Todaro Information, were publicly disclosed "in a Federal criminal . . . hearing in which the Government or its agent is a party."   § 3730(e)(4)(A)(i); see United States v. Reagan, 242 F.3d 385 (9th Cir. 2000) ("The indictment was a 'public disclosure' and triggered the public disclosure bar of § 3730(e)(4)(A).").

The news articles, as well as the press releases, were disclosed "from the news media."   § 3730(e)(4)(A)(iii); see Schindler Elevator Corp. v. United States ex rel. Kirk, 131 S. Ct. 1885, 1891 (2011) (The phrase "news media" and the other sources of public disclosure suggest "that the public disclosure bar provides a broad sweep.") (internal punctuation omitted); U.S. ex rel.

---

[9]        The inconsistent numbering and capitalization within the "original source" provision appear in the original text of the 2010 amendment.

Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc., 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002) (rejecting a "cramped reading" of the term "news media" and finding it to apply not only to news articles, but also to disclosures directed to a "smaller" or "professionally specialized" reader bases).[10]

The only remaining inquiry under § 3730(e)(4)(A) therefore is whether the CES/Todaro Disclosures contain "substantially the same allegations or transactions as alleged in the [instant] action."[11]  This is the case when the relevant disclosures exposed "all the essential elements of the fraud" alleged and made public the "crux of the alleged fraud."  U.S. v. N.Y.C. Dep't of Housing, Pres. and Dev., No. 09 Civ. 6547 (BSJ), 2012 WL 4017338, at *5 (S.D.N.Y. Sept. 10, 2012); see also U.S. v. Dialysis Clinic, Inc., No. 5:09-CV-00710 (NAM/DEP), 2011 WL 167246, at *6 (N.D.N.Y. Jan. 19, 2011) (provision is "applicable only if the essential elements exposing the transaction as fraudulent are publicly disclosed"); United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994) (*Qui tam* actions are prohibited "when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.").

---

[10]     For convenience, the Court generally will refer to the relevant public disclosures as the "CES/Todaro Disclosures."

[11]     Prior to the PPACA amendment, § 3730(e)(4)(A) barred jurisdiction over an action "based upon" the public disclosure of the allegations or transactions in a complaint.  A majority of circuit courts, including the Second Circuit, adopted the view that "based upon" meant that a relator's allegations would be barred if they were "substantially similar to" pre-complaint public disclosures.  Doe, 960 F.2d at 324; Glaser, 570 F.3d at 915 (citing cases); see also Dialysis Clinic, Inc., 2011 WL 167246, at *6 ("The Second Circuit follows the majority view and has repeatedly held that the relator's claim is 'based upon' the public disclosure if the allegations in the complaint are 'substantially similar' to the publicly disclosed information.").  Pre-PPACA cases therefore remain instructive as to whether the Complaint's allegations and the disclosed material are substantially the same. See Leveski v. ITT Educ. Servs., Inc., 719 F.3d 818, 829 n.1 (7th Cir. 2013) ("The current version of 31 U.S.C. § 3730(e)(4), which went into effect on March 23, 2010, expressly incorporates the 'substantially similar' standard previously used by our circuit and most other circuits under the prior version of the statute."); U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth., No. 1:10-CV-322, 2013 WL 3912571, at *7 (E.D. Tenn. July 29, 2013) ("[T]he general case law pertaining to the public disclosure bar would still be applicable to this Court regardless of if it was decided before or after the PPACA.").

In the year and a half prior to the filing of Plaintiff's original complaint in this action, the CES/Todaro Disclosures disclosed to the public that:

- The principals of two New York asbestos testing firms, CES and SAF (Todaro's firm), were being prosecuted for allegedly conducting a scheme to defraud the government.

- CES was alleged to have defrauded the government (by "impeding and impairing" its functions) by providing false air samples to asbestos abatement contractors, which led building owners to believe asbestos had been properly removed.

- Todaro, acting "through his company, SAF," created "false" or "bogus laboratory reports" purporting to show the results of air monitoring tests supposedly performed in connection with government abatement projects and submitted them to the government for unlawful financial gain.

These public disclosures are no doubt "substantially the same" as the allegations in the Complaint, which assert that EMSL and the Air Monitoring Defendants, all of which operated in the asbestos testing industry, participated in a scheme to defraud the government by preparing and providing "fake" air samples or "false" asbestos testing reports in connection with government abatement projects and then seeking and obtaining compensation from the government. No material aspect of this alleged scheme falls outside the scope of the information revealed in the CES/Todaro Disclosures. Accordingly, the Court finds that the CES/Todaro Disclosures are substantially the same as the Complaint's allegations.

It clear to the Court that the CES/Todaro Disclosures were "sufficient to set the government squarely upon the trail of the alleged fraud," In re Natural Gas Royalties, 562 F.3d 1032, 1041 (10th Cir. 2009), and it therefore rejects Plaintiff's contrary assertion that the CES/Todaro Disclosures were not "sufficient to lead the government to the Defendants in this action." (Opp'n 9.) As the Court in Springfield explained, application of the public disclosure bar is appropriate where

it is possible to say that the evidence and information in the possession of the

> United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute. The question, properly, then, is whether the information conveyed [to the government] could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.

14 F.3d at 654 (quoting U.S. ex. rel. Joseph v. Cannon, 642 F.2d 1373, 1377 (D.C. Cir. 1981)) (brackets in original). Plaintiff has alleged that EMSL is the largest, and one of the leading, environmental testing firms in the world with facilities in New York. (Compl. ¶ 46.) He has also alleged that the Air Monitoring Defendants, in addition to being EMSL's clients, (id. ¶ 49), are collectively involved in scores of major government abatement projects in the New York area. (Id. ¶¶ 50, 59, 67, 70, 73, 84, 88-89, 94, 96.) It is simply not plausible that government officials conducting an investigation into the frauds carried out by CES and Todaro were not alerted by the information uncovered during those investigations to the prospect of wrongdoing by Defendants in this case. Springfield, 14 F.3d at 654; see also Jamison, 649 F.3d at 332.[12]

The public disclosure provision thus appropriately serves its purpose here. Plaintiff filed his original complaint in this action shortly after substantial information about the alleged fraud had become available to the public. The provision thus prevents Plaintiff from being able to "'seek remuneration although [he] contributed nothing to the exposure of the [alleged] fraud.'" Kreindler & Kreindler, 985 F.2d at 1157 (quoting Doe, 960 F.2d at 319).[13]

---

[12]  The Court notes as an aside that it is apparent from the CES/Todaro Disclosures that the government actually took several steps along the "trail of the alleged fraud." The Disclosures indicate that the Todaro Prosecution "raised troubling questions" for authorities about how "widespread" such conduct might have been and whether Todaro's conduct was "the tip of the iceberg." It therefore led authorities to an "expand[ed] inquiry focused on some aspects of the work of asbestos and lead inspectors in the city" as to "how big the iceberg is," which investigation, as of mid-2010, "[wa]s very much ongoing." Also at that time, there apparently were "six other unrelated federal cases under way exploring similar allegations of similar practices in the New York City area."

[13]  To be sure, the Complaint contains some allegations against two Defendants that are not substantially the same as any facts disclosed by the CES/Todaro Disclosures. Plaintiff alleges that: (1) EMSL failed to comply with legally-mandated testing procedures and (2) Ambient conducted air quality analysis at unauthorized laboratories. These ancillary allegations, however, are insufficient to preclude application of the public disclosure provision. See Glaser v. Wound Care Consultants, Inc., 570 F.3d 907, 920 (7th Cir. 2009) ("It is true that Glaser's complaint adds a

### b.  Plaintiff is Not An "Original Source"

Because the allegations contained in the fraud were publicly disclosed, Plaintiff's action must be dismissed unless Plaintiff is an original source.  The Court concludes that he is not.

To reiterate, the current version of § 3730(e)(4)(B) provides two separate methods by which a relator may demonstrate he is an original source:

> "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

This definition "attempt[s] to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." Stennett v. Premier Rehab., LLC, 479 F. App'x 631, 635 (5th Cir. 2012) (internal quotations and citations omitted) (alteration added).

Under the first prong of § 3730(e)(4)(B), a relator may show he is an original source by demonstrating that: "prior to a public disclosure under subsection (e)(4)(a), [he] has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." § 3730(e)(4)(B)(i).  This basis for original source status is simply not met.  There are no allegations in the Complaint that Plaintiff acted to alert government officials as to the alleged fraud prior to the disclosure of the CES or Todaro Prosecutions.

Under the second prong of § 3730(e)(4)(B), Plaintiff must have knowledge that is both (1) "independent of" and (2) "materially adds to" the publicly-disclosed allegations or

---

few allegations not covered by CMS's investigation.  But this is not enough to take this case outside the jurisdictional bar, properly understood; 'based upon' does not mean 'solely based upon'.").  In any event, as set forth below, the Court dismisses these claims as inadequately pleaded.

transactions.  He must also demonstrate (3) that he "has voluntarily provided the information to the Government before filing an action under this section."

Construing the Complaint liberally, the first and third of these requirements are met. Although Plaintiff alleges to have worked for only three of the fifteen Defendants, he alleges that he was exposed to the alleged fraudulent activities of the other Defendants during his work at EMSL, of which all the Air Monitoring Defendants were clients.  See U.S. v. Northrop Corp., 5 F.3d 407, 411 (9th Cir. 1993) ("Barajas's knowledge of the testing and inspection fraud was direct and independent because he acquired it during the course of his employment at Northrop."); Stennett, 479 F. App'x at 635 ("Direct knowledge contemplates knowledge obtained from actually viewing source documents, or first hand observation of the fraudulent activity that provides the grounds for the *qui tam* suit.").  Accordingly, the Complaint alleges knowledge "independent of" the CES/Todaro Disclosures.  As to the third requirement, Plaintiff alleges that he "has voluntarily provided such information to the Government before filing this action."  (Compl. ¶ 7.)

Plaintiff, however, does not allege knowledge that "materially adds to" the information in the public disclosures.  Primarily for the same reasons (discussed below) the Court finds the Complaint to be insufficiently pleaded, it finds that the Complaint's rather bare bones allegations add little, and certainly add nothing material, to the previously-disclosed allegations or transactions.  Indeed, the Complaint contains very little factual content at all.  As outlined above, for all its length, the Complaint primarily consists of repetitive allegations that are similar as to each of the Air Monitoring Defendants—i.e., that each worked on government projects, that each took air samples they knew were "fake," and that each nonetheless billed the government.  That there is little substance to the Complaint comes as no surprise since Plaintiff had only indirect

contact with a large majority of the Defendants.

To be sure, the Complaint contains scattered allegations that certain of Plaintiff's colleagues professed to him that they too were aware of, or complicit in, a fraud, see, e.g., Compl. ¶¶ 77, 90, as well as certain other Defendant-specific details, see id. ¶¶ 63-64; 85-86. But none of these allegations can be said to *materially* add to the already robust universe of publicly-available information regarding schemes by asbestos companies to defraud the government.   On the whole, the Complaint's allegations are "not much different from the allegations or transactions of the public disclosures" and therefore cannot be said to materially add to the publicly-disclosed fraud.   U.S. ex rel. Lockey v. City of Dallas, Civ. A. No. 3:11-cv-354-O, 2013 WL 268371, at *16 (N.D. Tex. Jan. 23, 2013) (considering whether "'the investigation or experience of the relator either . . . translate[d] into some additional compelling fact, or . . . demonstrate[d] a new and undisclosed relationship between disclosed facts") (quoting U.S. ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Heathcare Sys., 384 F.3d 168, 179 (5th Cir. 2004)); U.S. ex rel. Osheroff v. Humana, Inc., No. 10-24486-cv-SCOLA, 2012 WL 4479072, at *12 (S.D. Fla. Sept. 28, 2012) (relator not an original source where "the information revealed in [r]elator's investigation . . . [wa]s not necessary to alert the Government to fraud that otherwise would have gone unnoticed."); Beauchamp, 2013 WL 1189707, at *12 ("Although relators may have had independent information that they obtained from their observations as Academi contractors, this knowledge does not materially add to the allegations already publicly disclosed. Indeed, all essential elements of the false billeting scheme were disclosed in the Garrow declaration, and relators' knowledge appears to add only illustrative examples of the specific behavior that the Garrow declaration describes with specificity.").

Accordingly, the Court holds that the FCA's public disclosure provision requires

dismissal.

## 2. The Complaint Does Not Plead Fraud With Particularity

### The Requirements of Fed. R. Civ. P. 9(b)

The Court further agrees with Defendants that Plaintiff has failed to meet the heightened pleading standard required under Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be stated with particularity.

To satisfy this heightened pleading requirement, "a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Wood ex rel. U.S. v. Applied Research Assocs., Inc., 328 Fed. App'x 744, 747 (2d Cir. 2009) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." U.S. ex rel. Polansky v. Pfizer, Inc., No. 04-cv-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (citation and internal quotation marks omitted). As the Second Circuit has explained, the purpose of this requirement is to "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit," as well as to "discourage the filing of complaints as a pretext for discovery of unknown wrongs." Wood, 328 Fed. App'x at 747 (citations omitted).

The Complaint's allegations fall well short of the "ample factual basis [that] must be supplied to support the charges" in a FCA suit. Id.

### Plaintiff Fails to Specify False Claims

Courts in the Second Circuit have held that "allegations of violations of federal

regulations are insufficient to establish a claim under the FCA if plaintiff cannot identify, with

any particularity, the actual false claims submitted by the defendant." <u>Dialysis Clinic, Inc.</u>, 2011

WL 167246, at *10 (citing <u>Johnson v. Univ. of Rochester Med. Ctr.</u>, 686 F. Supp. 2d 259, 265

(W.D.N.Y. 2010)); <u>see also</u> <u>U.S. v. Empire Educ. Corp.</u>, No. 11-cv-0035, 2013 WL 4068237, at

*2 (N.D.N.Y. Aug. 13, 2013) ("[Plaintiff] must not only allege with particularity the 'underlying

schemes and other wrongful activities' but also the resulting 'submission of fraudulent claims.'")

(quoting <u>U.S. ex rel. Mooney v. Americare, Inc.</u>, No. 06-cv-1806, 2013 WL 1346022, at *3

(E.D.N.Y. Apr. 3, 2013)).  Specifically:

> a relator must provide details that identify particular false claims for payment that
> were submitted to the government.  In a case such as this, details concerning the
> dates of the claims, the content of the forms or bills submitted, their identification
> numbers, the amount of money charged to the government, the particular goods or
> services for which the government was billed, the individuals involved in the
> billing, and the length of time between the alleged fraudulent practices and the
> submission of claims based on those practices are the types of information that
> may help a relator to state his or her claims with particularity.  These details do
> not constitute a checklist of mandatory requirements that must be satisfied by
> each allegation included in a complaint.  However, . . . we believe that some of
> this information for at least some of the claims must be pleaded in order to satisfy
> Rule 9(b).

<u>Polansky</u>, 2009 WL 1456582, at *4 (quoting <u>United States ex rel. Karvelas v. Melrose-

Wakefield Hosp.</u>, 360 F.3d 220, 232-33 (1st Cir. 2004)).

The Complaint contains general allegations that "[a]ll defendants have fraudulently

obtained government funds in connection with the federal, state, and NYC air monitoring

projects."  Compl. ¶ 45; <u>see also</u>, <u>id.</u> ¶ 58 ("The defendants used these fraudulently generated

reports to obtain funds from the federal, state, and local government."); <u>id.</u> ¶ 128 ("As a result of

Defendants' illegal and fraudulent practices, the federal, state, and local government and the

public have suffered serious damages.").   It also asserts, in repetitive fashion, that each of the

Air Monitoring Defendants billed the government, directly or indirectly, for the samples they

collected, and were compensated for doing so.  See Compl. ¶¶ 59, 61, 65, 67, 73, 83, 88, 94, 96, 98, 100.  And it asserts similarly general allegations as to EMSL.  See, e.g., Compl. ¶ 51 ("EMSL submits invoices to the federal, state, and local government, its co-defendants, or the general contractors based upon the air sampling work provided, and receive compensation based upon said work provided."); id. ¶ 57 ("EMSL conspired with its co-defendants and generated these data and testing reports for the purpose of defrauding the government for money.").

Nowhere in the Complaint, however, does Plaintiff identify a particular false claim that was submitted to the government for payment by any Defendant.  Dismissal is appropriate on this basis.  See Dialysis Clinic, Inc., 2011 WL 167246, at *11 (complaint dismissed where plaintiff "fail[ed] to identify even one, specific fraudulent claim"); U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1312 (11th Cir. 2002) (FCA claim dismissed because "[n]o amounts of charges were identified.  No actual dates were alleged. . . . No copy of a single bill or payment was provided.").[14]

**Plaintiff Fails Adequately to Explain Why The Statements Were Fraudulent**

Furthermore, despite having carefully reviewed the Complaint, the Court struggles to discern the precise nature of the alleged fraudulent scheme.  The gist of the Complaint is that the Defendants "faked" their monitoring or testing work but nonetheless told the government they had actually done such work.  The Complaint fails, however, to provide a coherent theory as to how Defendants implemented this scheme or why the scheme the allegedly implemented was indeed fraudulent.  Most of the Complaint's allegations in this regard are hopelessly vague.

---

[14]      While it is true that requirements of Rule 9(b) may be relaxed in a case where the plaintiff is not in a position to know specific facts until after discovery and where the opposing party has particular knowledge of the facts, see Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990), this is not that case.  Plaintiff cannot reference a single specific false claim submitted by EMSL despite having worked there from 2006 to 2010, nor one submitted by either Detail or Airtek despite having been employed by both companies for approximately eighteen years.  Indeed, it is particularly troubling that Plaintiff's allegations as to these Defendants are pleaded with little more particularity than the several other Air Monitoring Defendants that did not employ Plaintiff.

Certain paragraphs of the Complaint, for instance, conclusorily assert that the Air Monitoring Defendants' samples, and EMSL's reports, were "false."  Compl. ¶¶ p. 2, 57, 119-20.  Other paragraphs describe the air samples as having been "improperly taken, fake, and/or blank," id. ¶¶ 59, 61, 65, 67, 73, 83, 93-94, 96, 98, 100, 102, or allege that they "would definitely pass the tests because there was nothing in them," id. ¶ 55; see also id. ¶ 126.

As an initial matter, alleging that an Air Monitoring Defendant submitted "blank" samples is not suggestive of fraud.  To the contrary, the regulation governing "Detailed Procedures for Asbestos Sampling and Analysis—Non-Mandatory" advises that "[b]lank samples [be] used to determine if any contamination has occurred during sample handling."  29 C.F.R. § 1910.1001, App'x B § 5.2.9.  The regulation further instructs air samplers as follows:

> Prepare two blanks for the first 1 to 20 samples.  For sets containing greater than 20 samples, prepare blanks as 10% of the samples.  Handle blank samples in the same manner as air samples with one exception: Do not draw any air through the blank samples.  Open the blank cassette in the place where the sample cassettes are mounted on the employee.  Hold it open for about 30 seconds. Close and seal the cassette appropriately.  Store blanks for shipment with the sample cassettes.

Id.  Because this regulation provides for the submission of "blank" samples, alleging that submitted samples were "blank" does not allege fraudulent activity unless Plaintiff also alleges that the relevant samples were "blank" when they should have indicated the presence of airborne asbestos fibers.  The Complaint contains no such allegation.

Construed liberally, the Complaint's allegations could suggest that the air samples provided by an Air Monitoring Defendant (and tested by EMSL) were either: (i) not conducted in compliance with the relevant standards for measuring the presence of airborne asbestos fibers at abatement sites, or (ii) not the product of any testing at all when they should have been.  It is unclear to the Court, however, whether and when Plaintiff is alleging which theory as to any given Defendant, or if he is alleging both.

What is clear, rather, is that the one-page reports attached to the Complaint, purporting to "reflect[] tests performed [by EMSL] on fake samples submitted" by each Air Monitoring Defendant (Opp'n 17), do not on their face provide support for either theory.  While certain of these reports, involving samples provided by JLC and Airtek, appear to reflect that no asbestos fibers were present in the samples, this fact no more compels an inference of fraudulent activity than it does an inference that no asbestos was present at the site (pre- or post-abatement) when the sample was taken or that the no air was passed through the samples on purpose in compliance with the above-quoted regulation.  Other reports, involving samples provided by Liro, Hillman, Detail, Consulting & Testing and Louis Berger, actually *do* reflect the presence of asbestos fibers, which would appear to undercut Plaintiff's allegations that the samples were "fake" or "blank" and that EMSL did not properly test them.  Plaintiff's theory of fraud may have been better (though perhaps still not adequately) supported had the Complaint explained why these documents serve to demonstrate the tested samples were "fake."  Plaintiff did not and instead asks the Court to entertain his conclusory assertion that they do so demonstrate.  The Court is not permitted, in the context of a fraud pleading, to take such a leap of faith.[15]

Moreover, given that, as discussed above, the Complaint does not provide any details as to the who, when or why of the false claims themselves, the precise manner in which Defendants' "fake" samples and "false" testing reports are linked to the "false reports and invoices" allegedly submitted to the government remains unclear (not to mention what false statements those reports and invoices actually contained).

---

[15]    Nor is the Court permitted to consider, in deciding these motions, the declaration Plaintiff submitted in connection with his opposition brief purporting to set forth an explanation as to "how it is he was able to tell that these documents reflect fake samples in that they all reported zero or one fibers."  (Opp'n 21.)  As Plaintiff acknowledges when attacking a declaration submitted by EMSL's representative in connection with its motion, considering such material at the motion to dismiss stage is inappropriate.  See Opp'n 14 n.3 ("Because this is a motion to dismiss, Plaintiff respectfully submits the DeMalo Declaration can not be considered.").

*Plaintiff's Alternative Theories of Fraud Are Inadequately Pleaded*

As noted, <u>see</u> n.13, <u>supra</u>, the Complaint also makes certain ancillary allegations directed to individual Defendants, specifically that: EMSL failed to comply with regulatory and quality control requirements, and Ambient conducted air quality analysis at unauthorized laboratories. Largely for the reasons expressed immediately above, these claims are also inadequately pleaded. First, it is not immediately clear how these allegations support a cognizable claim under the FCA—they seem to allege mere regulatory violations, not actionable fraud—and the Complaint, once again, does not explain further. Generously construed, however, these allegations could suggest that Defendants' performance of tests under circumstances they knew were not compliant with governing regulations somehow tainted the results, and that the claims submitted to the government in connection with these tests were therefore fraudulent.

Not only does this theory make little sense, these alleged fraudulent schemes are not supported by the particulars (including, for instance, which claims were submitted) that courts have found necessary to survive a motion to dismiss on Rule 9(b) grounds. <u>See</u> <u>Dialysis Clinic, Inc.</u>, 2011 WL 167246, at *11 (complaint dismissed where plaintiff "vaguely allege[d] that from 2004 to present, defendant submitted fraudulent claims for payment based upon false certifications that defendant was in compliance with Medicare rules and regulations for quality of care").

*Leave to Amend Would Be Improper*

Even assuming Plaintiff's claims were not also dismissed on the independent basis that the Complaint's allegations were publicly disclosed, leave to amend would be inappropriate. While leave to amend must be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), a court may, in its discretion, decline to grant leave if it would prejudice the opposing party or

where the proposed amendment would be futile.  Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 229 F.R.D. 441, 443 (S.D.N.Y. 2004); La Russo v. St. George's Univ. Sch. of Med., No. 12-cv-03093 (ER), 2013 WL 1285412, at *8 n.8 (S.D.N.Y. Mar. 28, 2013) (Dismissal with prejudice is appropriate when "plaintiff is unable to demonstrate that he would be able to cure [the complaint's] defects in a manner that would survive a motion to dismiss.")  As mentioned above, Plaintiff submitted a declaration in connection with his opposition to Defendants' motions.  In his opposition, Plaintiff advises that "[i]f the Court so requires, Plaintiff stands ready to amend his complaint to include allegations contained in his declaration."  (Opp'n 2, n.1.)

The Court notes initially that the Complaint is Plaintiff's fourth pleading in nearly three years.  Most recently, the Court granted Plaintiff leave to file the Complaint after Defendants apprised him, pursuant to the Court's rule, of the bases for their contemplated dismissal motions. See, e.g., Dkt. 62.  The purpose of that rule is to avoid the precise scenario Plaintiff now proposes: that the parties and the Court, having spent substantial resources addressing Defendants' attacks on one complaint, spend additional resources addressing a similar attack on another.  Requiring Defendants to move to dismiss what would be Plaintiff's fourth amended complaint when Plaintiff was on notice of the deficiencies in his operative complaint and could have included in it the allegations in his declaration would prejudice Defendants.

In any event, the Court has reviewed Plaintiff's declaration and finds that the proposed amendments would be futile.  These proposed amendments do not materially improve on the Complaint's allegations.   For instance, a fourth amended complaint incorporating these allegations still would not include facts identifying specific false claims.  Amendment would therefore be inappropriate.

### 3.  Plaintiff's State and Local Claims Must Be Dismissed

The New York FCA and New York City FCA closely track their federal counterpart. The Complaint pleads no additional facts that distinguish his state and local FCA claims from his federal claim.  These claims therefore suffer from the same deficiencies as his federal claim. Accordingly, these claims are dismissed as well.  See, e.g., Dialysis Clinic, Inc., 2011 WL 167246, at *21 ("The N.Y. False Claims Act is closely modeled on the federal FCA. Accordingly, plaintiff's claims under the state statute are subject to dismissal for the same reasons as plaintiff's federal FCA claims.") (internal punctuation omitted); Beth Israel Med. Ctr., 736 F. Supp. 2d at 816 (state FCA claim failed for same reason as federal FCA claim); *Briefing Paper of the Governmental Affairs Division: Examining the Usage and Efficacy of New York City's False Claims Act*, 20120229A NYCBAR 111 (January 20, 2012) ("Briefing Paper") ("The City FCA, like the federal FCA it was modeled after, is intended to protect and enhance the public coffers and save taxpayers money by uncovering fraud against the City and by rewarding whistleblowers who bring forth information about fraudulent claims.").

Moreover, Plaintiff does not allege that he is authorized to sue under the New York City FCA, which requires that claims may be brought only by Corporation Counsel or by a person authorized by Corporation Counsel to bring them.  See N.Y.C. Admin. Code § 7-804(e); see also Briefing Paper ("Within 180 days of receipt of a proposed civil complaint, the Corporation Counsel must inform the person who submitted it that the City will either: (1) commence a civil enforcement proceeding based upon the complaint (in which case the Corporation Counsel is required to commence a proceeding within 90 days of such notice); (2) authorize the person who submitted the complaint to commence such a proceeding; or (3) decline to commence a proceeding—in which case no proceeding may be brought either by the City or the person who submitted the proposed civil complaint.").  Plaintiff's New York City FCA claim is deficient on

this ground as well.

**4.  EMSL Was Not Properly Served**

EMSL has moved to dismiss on the additional basis that it was not properly served. Plaintiff does not dispute that he failed to serve EMSL within the 120-day period set forth in Federal Rule of Civil Procedure 4(m).  He concedes in his opposition brief that "service upon EMSL" was "late."  (Opp'n 28.)  He instead argues that he has established good cause for late service.

While courts "must extend the time for service upon a showing of good cause for the delay . . . [g]ood cause is generally found only in exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond its control." E. Refractories Co. v. Forty Eight Insulations, Inc., 187 F.R.D. 503, 505 (S.D.N.Y. 1999).  "An attorney's inadvertence, neglect, mistake or misplaced reliance does not constitute good cause." Id.; see also Spinale v. U.S., No. 03 Civ. 1704 (KMW) (JCF), 2005 WL 659150, *3 (S.D.N.Y. Mar. 16, 2005) ("In order to establish good cause for failure to effect service in a timely manner, a plaintiff must demonstrate that despite diligent attempts, service could not be made due to exceptional circumstances beyond his or her control.").  "A party seeking a good cause extension bears a heavy burden of proof."  Id.

In an affidavit submitted in connection with his opposition, Plaintiff's counsel avers that service as to EMSL was late because, while he "did timely make arrangement for the service of process," his "process server . . . had unexpected difficulties" in serving EMSL and was only able to serve EMSL "[a]fter multiple attempts."  (Declaration of Heng Wang, Esq. ¶ 4; see also Opp'n 28.)  However, "[m]isplaced reliance on a process server does not suffice to establish good cause for a failure to effect service."  Sadler v. 148 Acad. Realty, LLC, No. 08 Civ. 3338

(KMK) (LMS), 2010 WL 3952862, at *1 (S.D.N.Y. Oct. 8, 2010).  Further, Plaintiff makes no effort to explain what such "unexpected difficulties" were, why they were beyond his control or why it took him multiple attempts to serve a former employer whose publicly-registered statutory agent for service of process in New York is listed on the New York Department of State website.

Plaintiff has failed to meet his "heavy burden" of establishing good cause.  Accordingly, the Court agrees that this is an additional basis on which Plaintiff's claims against EMSL must be dismissed.[16]

### 5.  Warren & Panzer's and ATC's Motions for Attorneys' Fees are Denied

Warren Panzer and ATC Group seek attorneys' fees.  The FCA authorizes an award of attorney fees and expenses to a defendant "if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment."  31 U.S.C. § 3730(d)(4); see also U.S. ex rel. Mikes v. Straus, 98 F. Supp. 2d 517, 526 (S.D.N.Y. 2000) ("[F]ees are only to be awarded where the underlying action was clearly frivolous or clearly vexatious or primarily harassing in nature—and even then, an award is not mandatory.") (emphasis in original), aff'd, 274 F.3d 687 (2d Cir. 2001).

Warren & Panzer and ATC (who are represented by the same counsel) argue that Plaintiff's claims are "patently frivolous" because 1) Plaintiff's claims were publicly disclosed, 2) Plaintiff "failed to plead with particularity," 3) Plaintiff did not allege that they submitted a false claim to the government, and 4) none of Plaintiff's claims against them are based on his "own direct and independent knowledge."  Defendant Warren & Panzer, Engineers, P.C.'s

---

[16]       Although the Court may in its discretion extend the time for service even absent good cause, see Zapata v. City of N.Y., 502 F.3d 192, 193 (2d Cir. 2007), it declines to do so here.

Memorandum of Law in Support of Its Motion to Dismiss the Third Amended Complaint at 12-15; Defendant ATC Group Services Inc.'s Memorandum of Law in Support of Its Motion to Dismiss the Third Amended Complaint at 8-9.

As a general matter, these are bases for dismissal, not for an award of fees. The Court has reviewed the declarations Warren & Panzer has submitted to support its application and finds nothing in them that convinces the Court that such an award is appropriate. In short, although the Court agrees that dismissal is appropriate, the bases therefor are not "so staggeringly obvious [as to] render[] [Plaintiff's] action *objectively* frivolous." U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C., 739 F. Supp. 2d 396, 408 (S.D.N.Y. 2010) (emphasis in original; internal quotation marks omitted).

## CONCLUSION

For the reasons set forth above, the Complaint is dismissed in its entirety. The motions for attorneys' fees are denied. The Clerk of Court is directed to terminate item numbers 62, 67, 78, 82, 87, 92, 96, 107, 125 and 134 on the docket and to close this case.

SO ORDERED.

Dated:       August 16, 2013
             New York, New York

                                              Ronnie Abrams
                                              United States District Judge

35